1 ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
2
MARTHA BOERSCH (CABN 126569)
3 Chief, Criminal Division

4 KEVIN YEH (CABN 314079)
S. WAQAR HASIB (CABN 234818)
5 Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
7     Telephone: (415) 436-7200
    kevin.yeh@usdoj.gov
8     waqar.hasib@usdoj.gov

9 Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | **CASE NO. 3:24-CR-81-RFL** |
|---|---|---|
| Plaintiff, | ) ) | **UNITED STATES' MEMORANDUM IN SUPPORT OF DETENTION MOTION** |
| v. | ) ) | |
| GEORGE ABOAGYE, et al., | ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

As a central figure in a wire fraud conspiracy involving business email compromises and romance scams—which utilized false identities, shell companies, and the targeted scamming of individuals and businesses—George Aboagye has the ability and means to flee from accountability. When he was arrested and his residence was searched, agents found numerous seemingly fake IDs, Social Security cards, credit cards, etc., under multiple aliases. Agents also estimate that Aboagye has wired at least $1.7 million out of the United States to Ghana over the last five years—all likely the proceeds of his scams since (as discussed below) it is unclear whether Aboagye has been legitimately employed since 2018 besides a recent stint at Kroger supermarket. There are literally dozens, possibly

U.S. DETENTION MEM.      1
3:24-CR-81-RFL

hundreds, of victims in the charged conspiracy, located not only in the Northern District of California, but across the nation and overseas as well. Aboagye and his co-conspirators have caused millions of dollars of economic harm to these victims. Since scams appear to be his primary mode of supporting himself, he is likely to continue his fraudulent ways if released, presenting an economic danger to the community.

In addition to being seemingly adept at creating fake IDs or opening fraudulent credit card and bank accounts, Aboagye also appears to have significant familial and business ties to Ghana; in contrast, it is unclear what legitimate ties he has here. Facing justice for the first time, he now also has an increasing incentive to flee as his sentencing exposure grows with each new scam uncovered by agents. That incentive to flee, coupled with his ability and means to do so, creates a serious risk of flight. Accordingly, he should be detained pending trial.

## PROCEDURAL HISTORY

George Aboagye and his co-defendants Dennis Jordan and Emmanuel Awuah were indicted by a grand jury in the Northern District of California on February 8, 2024. The indictment alleges a single count against all three defendants of conspiracy to commit wire fraud. All three defendants were arrested on February 14, 2024: Aboagye in Atlanta (Northern District of Georgia), Awuah in Boston (District of Massachusetts), and Jordan in Dallas (Northern District of Texas). The same day, federal agents executed search warrants at the residences of all three defendants.

On February 20, 2024, Aboagye had an initial appearance before the Honorable John K. Larkins, United States Magistrate Judge for the Northern District of Georgia. The government moved for detention on the grounds that Aboagye poses a danger to the community through economic harm and a serious risk of flight. Pretrial Services prepared a report concluding that Aboagye posed both a risk of nonappearance and a danger to the community, but recommending release on a $10,000 unsecured bond with surrender of any passports.

On February 20th, Judge Larkins held a detention hearing. N.D. Ga. Case No. 24-mj-108, Dkt. No. 7. At the conclusion of the 37-minute-long hearing, Judge Larkins agreed with the government and granted its motion, ordering Aboagye detained pending transfer to this district. The court found Aboagye to be a flight risk because: (1) the "[w]eight of the evidence against the defendant is strong";

(2) "[l]ack of stable employment"; (3) "[l]lack of significant community or family ties to this district"; (4) "[s]ignificant family or other ties outside the United States; and, significantly, (5) "[u]se of alias(es) or false documents." *Id.* Dkt. No. 8.

In particular, Judge Larkin found the following: "Defendant is alleged to have participated in large-scale, international business email compromise and romance schemes. The government proffered that Defendant wired $1.7 million to bank accounts in Ghana. The weight of the evidence is strong. The indictment outlines the alleged schemes in great detail, and Defendant made incriminating admissions to law enforcement following his arrest. At his arrest, agents recovered numerous false/fraudulent IDs and payment cards. He has substantial ties to Ghana. Meanwhile, he has no ties to the charging district and virtually no ties to Georgia. His employment history is sporadic and, indeed, the government proffered that he had misstated his employment history to pretrial services. As noted, the fraud extends beyond the United States, which makes it difficult to track or seize stolen funds." *Id.*

Aboagye was transferred to this district and had his initial appearance on March 8, 2024. A hearing for identification of counsel and status on detention was held on March 12, 2024, and a detention hearing was set for March 15, 2024. Dkt. No. 12.

## ARGUMENT[1]

The record establishes that defendant George Aboagye poses both a flight risk and a danger to the community through pecuniary or economic harm, pursuant to the statutory factors set forth in 18 U.S.C. § 3142(g).

### A. The Nature and Circumstances of the Offense Charged (18 U.S.C. § 3142(g)(1))

George Aboagye is at the heart of the conspiracy alleged in Count One of the indictment. The conspiracy involves a scheme to use business email compromises and romance scams to defraud companies and individuals of money, and evinces sophisticated means and a thorough understanding of how to surreptitiously hide and transfer large sums of stolen money. There are dozens, possibly hundreds, of victims across the country and worldwide. Some of the U.S.-based romance fraud victims that FBI has interviewed have lost as much as $500,000 of their personal savings to the defendants. As

---

[1] As instructed by the Court, no standard of review is included in this memorandum.

discussed in further detail below, Aboagye's financial fingerprints are all over several of the transactions detailed at length in the indictment.

### i. Victim D.R.

Victim D.R. is a San Francisco-based real estate holdings company. In December of 2019, after an unwitting employee had their work email hacked, Victim D.R. was duped into sending a wire transfer for $922,445.34 to a JP Morgan Chase (JPMC) bank account for a company called "Clark Cooling & Heating," believing that the money was actually going to one of Victim D.R.'s service providers.

The mailing address for the Clark Cooling & Heating account at JPMC was on Rockingham Avenue in West Roxbury, Massachusetts. That is co-defendant Emmanuel Awuah's current home address (which was searched on February 14, 2024).

However, a review of the Clark Cooling & Heating account statements show that it was plainly being used on a day-to-day basis, not by Awuah, but by Aboagye, as a personal account. The vast majority of charges were for restaurants, car repairs, and purchases at retail businesses in the Atlanta suburbs (e.g., Nike), particularly around Douglasville, Georgia, where Aboagye resides. Notably, there were several charges at Publix supermarkets, where Aboagye told Pretrial Services in Georgia that he has worked as a baker since 2017. There were no charges in Massachusetts, however, and no indications suggesting that there was any legitimate business being conducted by a cooling and heating company.

On the other hand, these records indicate several payments from Clark Cooling & Heating via Zelle or Paypal to bank accounts owned by Aboagye and held in his name or one of his aliases. In particular, there were multiple Zelle payments to a Bank of America account held in Aboagye's name on the day immediately after the stolen $922,455.34 from Victim D.R. appeared in the Clark Cooling and Heating account. There were also other transactions that day—a $20,000 cash withdrawal believed to be by Awuah and a $25,000 cashier's check deposited by co-defendant Dennis Jordan.

A business with the name of Clark Cooling & Heating Services was registered in November of 2018 in Massachusetts by someone purportedly named "George Clarke." "George Clarke" also opened the JPMC bank account described above. "George Clarke," however, is a fake identity that Aboagye and other members of this conspiracy have used over the last several years to engage in their schemes.

For example, "George Clarke" listed gclarke2244@gmail.com as its email account when opening the bank account. That email account, much like the JPMC bank account, was plainly being used by Aboagye for personal purposes:

- Gclarke2244 sent emails to a travel agent to book flights to Accra, Ghana, in the name of George Aboagye.
- Glclarke2244 bought a Delta Airlines ticket from Boston to Atlanta in the name of George Aboagye.
- Gclarke2244 also bought clothes from GiuseppeZanotti.com shipped to George Aboagye at a residential address in suburban Atlanta.
- Gclarke2244 communicated with a travel company about buying tickets for a cruise in the name of George Aboagye.
- Gclarke2244 emailed a copy of a waiver of liability from an Atlanta-area skydiving company to himself, signed by George Aboagye, along with photos from the dive, which appear to depict the defendant:



ii.  Victim G.B.

Victim G.B. is an elderly man in Poway, California. G.B. met an individual he believed to be

"Jennifer Anderson" on a dating website. "Anderson" befriended G.B. and eventually led him to believe that she had come into a large inheritance in Europe, but needed money to travel to Europe and pay for legal fees associated with the inheritance.

As a result, in July 2022, G.B. wired $55,000 to an account at JPMC held in the name of a company called Joe Cooling and Heating. "Anderson" explained that Joe Cooling and Heating belonged to her uncle, who was helping her handle the supposed European inheritance.

JPMC records for the Joe Cooling & Heating account show that shortly after Victim G.B. wired the money, there was an outgoing $48,000 transfer to a bank account held in Aboagye's name at the Publix Employees Federal Credit Union (PEFCU). There were additional payments from Joe Cooling & Heating to pay rent at the suburban Atlanta address at which Aboagye was arrested on February 14, 2024. There were also multiple ATM withdrawals in Douglasville, GA, where Aboagye resides.

Agents learned that the Joe Cooling & Heating account was opened by an individual purportedly named "Jordan Frazier." To open the account, "Jordan Frazier" presented JPMC with a fake Georgia driver's license, which appears to bear Aboagye's photo:



### iii. Victim W.S.

Victim W.S. is an elderly man living in Wisconsin. Like G.B., W.S. met an individual he believed to be "Bella Quinn" on a dating website. "Quinn" told a similar story about coming into a large inheritance in Europe, and needing money to travel there to handle logistics related to it. "Quinn" advised W.S. that her "Uncle George" would help arrange the details. As a result, W.S. mailed $318,400 in cashier's checks payable to George Aboagye to Aboagye's residence in Georgia.

On another occasion, "Quinn" told W.S. that "Uncle George" had a lawyer named "Samuel Dunnuck" who needed to be paid. As a result, Victim W.S. sent a $45,000 a cashier's check to "Samuel Dunnuck." Bank records show that "Dunnuck" then wrote a $42,000 check to George Aboagye, which was deposited into the PEFCU account in Aboagye's name. "Dunnuck" also transferred funds to the Joe Cooling & Heating JPMC account, which were again used to pay the rent at Aboagye's residence in suburban Atlanta. When agents searched Aboagye's residence, they found a Georgia driver's license depicting Aboagye with the name "Sammuel Dunnuck."

In sum, the nature and circumstances of this case demonstrate that Aboagye is a prolific fraudster who is adept at using multiple identities to defraud businesses and individuals, and to launder those fraudulent proceeds through multiple front companies, all for his and his co-conspirators' benefit. In other words, he has the ability and means to flee, and the ability to harm others along the way should he choose to do so. This strongly weighs in favor of detention.

**B.    The Weight of the Evidence (18 U.S.C. § 3142(g)(2))**

The weight of the evidence against Aboagye is strong. Agents have photographic evidence that Aboagye is behind several of the fake identities used to perpetrate the fraudulent schemes alleged in the indictment, and Awuah stated in a post-arrest interview that Aboagye ran Clark Cooling and Heating. Agents have also determined that at least some of Aboagye's aliases, such as "George Clarke," were shared with other members of the conspiracy besides Aboagye. For example, agents know that, on at least one occasion, co-defendant Awuah purchased airlines tickets in his own name using the George Clarke email address. Agents have also determined that there were frequent money transfers between Awuah and Aboagye, strongly indicating that an agreement existed between them to engage in the schemes described in the indictment.

In addition, during the search of Aboagye's residence, agents recovered additional evidence of Aboagye's prolific fraudster activities. There were no fewer than four Social Security cards—one in the name of "Jordan Frazier" and one in the name of "Samuel Dunnuck" (a name under which Aboagye also had a fake driver's license)—but also two additional cards in the names of individuals that agents had not yet encountered during their years-long investigation, suggesting that agents have only scratched the surface of the scope of Aboagye's schemes. They also recovered numerous credit cards—again, several were in names known to be used by Aboagye as false identities, but several were in names that were unknown until now. A conservative Guidelines calculation based solely on conduct relating to fully-identified victims D.R., W.S., and G.B. suggests that Aboagye is facing a range of 46–57 months. That range is sure to increase as agents uncover more victims and more scams.

### C. Aboagye's History and Characteristics, Including Employment and Financial Resources (18 U.S.C. § 3142(g)(3))

Aboagye's history and characteristics are troubling. On the one hand, he has no known history of violence or drug abuse. He also reported to Pretrial in Georgia that he has a job at a Kroger's meat counter since last August—this may well be true, as agents have evidence that he recently deposited what appears to be a Kroger's paycheck into one of his many bank accounts. On the other hand, his main source of income for the past several years appears to be scamming. Indeed, Aboagye reported to Pretrial that he arrived in the United States in 2014, but he was arrested that same year in Roswell, Georgia, for identity theft, and again in 2015 in Lawrenceville, Georgia, for fraudulent use of a credit card. Thus, it appears that Aboagye has been engaged in fraud from virtually when he stepped foot in the United States.

Notably, Aboagye reported to Pretrial Services that he worked full-time as a baker at Publix Supermarkets from 2017 to the present, until they recently cut back his hours. This appears to be a lie: Publix records indicate that he stopped working there **in 2018**. But even if those records were somehow inaccurate, Aboagye was living well beyond the means that one would expect from a baker in a supermarket. For example, agents are aware that Aboagye purchased a Mercedes-Benz SUV **in cash** in approximately 2021 and had it shipped to his home country of Ghana. He also traveled frequently, to Ghana in 2020, 2022, and 2023, and to London in 2023. More alarmingly, from 2020 until the present,

he has wired over **$1.7 million** to a bank account in Ghana held in the name of George and Macella Aboagye. At his alleged monthly income of $1,820 from Publix, it would have taken him approximately **78 years** (without spending a penny for life expenses) to earn that amount of money. But as noted, he appears to have worked there for only about a year.

Along similar lines, Aboagye reported to Pretrial that he worked remotely for "Clock Cooling & Heating" in 2016 and 2017, in their IT department. Assuming that Pretrial meant to write Clark (not Clock) Cooling & Heating, then this too was a fabrication. Agents are aware of no legitimate business activity conducted by that company, whether relating to HVAC, or information technology, or anything else. Rather, as noted above, Clark Cooling & Heating was a front company used entirely by Aboagye and his co-conspirators as a vehicle for committing widescale fraud.

**D.      Aboagye Poses a Threat of Economic Harm to the Community (18 U.S.C. § 3142(g))**

As this Court noted at the last hearing, the Ninth Circuit has held that danger to the community for detention purposes can include economic harm. *See United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992); *see also United States v. Posey*, No. 18-CR-00408-CRB-1, 2020 WL 2838793, at *1 (N.D. Cal. June 1, 2020) ("economic danger may be a reason to deny pretrial release"); *United States v. Kakkar*, No. 5:13-CR-00736-EJD, 2017 WL 4163291, at *2 (N.D. Cal. Sept. 20, 2017) ("The court therefore concludes that Defendant will continue to constitute an economic danger to the community if permitted release."). In *United States v. Lindsey*, in which the defendant "targeted vulnerable and impoverished individuals," used stolen identities and "profited" while his victims "were left with ruined credit," the Ninth Circuit held that the defendant "is a danger to individuals and the community" and affirmed the denial of bail. *United States v. Lindsey*, 680 F. App'x 563, 567–68 (9th Cir. 2017).

Here, Aboagye poses a serious risk of economic harm to the community if released pending trial. As described above and in the indictment, Aboagye has participated in multiple fraudulent schemes for the last several years. The vast majority, if not all, of his known income appears to come from illegitimate sources. Thus, the likelihood that he would return to his familiar ways is high, creating serious danger to additional potential victims.

The transaction in which Aboagye engaged with Victim D.R. alone was worth $922,445.34. Victims W.S. and G.B. report losing as much as $500,000 of their personal lifetime savings. However,

most distressingly, agents suspect Victims D.R., W.S., and G.B. are just the tip of the iceberg. Aboagye and his codefendants appear to have defrauded dozens, if not hundreds, of potential victims as part of their conspiracy. Several of the bank accounts controlled by Aboagye and his co-conspirators, including accounts held by Clark Cooling & Heating and Joe Cooling & Heating, received regular, large wire transfers from individuals who appear to be elderly or otherwise vulnerable. Agents also know that at least some of the defendants in this case, including Aboagye, were communicating with victims by encrypted applications—schemes that will only come to light as the electronic devices seized last month during searches Boston, Atlanta, and Dallas are searched.

Indeed, in his post-arrest interview, Aboagye admitted to working with individuals he knew to be part of a fraud scheme. He stated that these individuals would send him tens of thousands of dollars that he would deposit in his own account. He also conceded that electronically sent fraud proceeds would go to one of his alias accounts, and he would keep five to ten percent himself as payment, and wire the remainder to Ghana. He admitted that he knew that it was illegal to use fraudulent identities to set up bank accounts, but he did so anyway under the George Clarke, Samuel Dunnuck, and other aliases.

Furthermore, Aboagye's frauds appeared to have been ongoing until his arrest. The presence in his residence of multiple IDs, Social Security cards, and credit cards with various names, some of which were unknown to agents until they searched his house, strongly indicates that he poses a serious threat of economic harm to the public if he is released.

**E.    Aboagye Poses a Serious Risk of Flight**

Equally troubling as the economic threat of harm is the fact that Aboagye poses a serious risk of flight. Aboagye is a green card holder, originally from Ghana. But although he is here legally, his adeptness at using multiple false identities to open shell businesses and bank accounts and pose as different people shows that simply taking his passport and imposing a bond will not adequately assure his future appearances in court.

Aboagye has both the ability and the means to flee. With regard to ability, in *United States v. Cohen*, which presented a challenge to a detention order, Judge Ilston noted, "The fact that defendant used over 30 domestic and at least six Swiss accounts, as well as the fact that the government keeps discovering additional accounts which have not been voluntarily disclosed by Mr. Cohen, substantiate

U.S. DETENTION MEM.                              10
3:24-CR-81-RFL

the Court's concern that defendant has access to undisclosed funds and is a flight risk." *United States v. Cohen*, No. C 10-00547 SI, 2010 WL 5387757, at *9 (N.D. Cal. Dec. 20, 2010).

Virtually identical facts are presented here. As discussed throughout, the evidence uncovered to date, and evidence that agents continue to uncover, show that Aboagye has used many false aliases and fraudulent accounts registered to fake companies to further his schemes. He also appears skilled in covering his tracks. As discussed earlier, Aboagye and his co-conspirators employ multiple accounts and aliases through which to transfer and presumably obscure the path of their fraudulent proceeds. He hides his fingerprints in other ways too. For example, in his post-arrest interview, Awuah reported that in 2023, Aboagye overnighted two checks from Ghana to Awuah, with values of $40,000 and $70,000, for him to deposit via mobile app on Aboagye's behalf. Aboagye then instructed Awuah to shred the checks and delete the app from Awuah's phone.

Agents also believe that Aboagye and other members of this conspiracy routinely use false credit cards to pay for airline tickets, resulting in at least some airlines (e.g., American, Delta) red-flagging members of the conspiracy and requiring them to pay for tickets in cash, or to physically present the credit cards they are using at ticket counters. *See United States v. Zaragoza*, No. CR-08-0083 PJH, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008) (finding that defendant's "use of false identification and his attempts to seek the participation of other individuals in the use of false names," in part, supported detention based on flight risk). Despite this limitation, Aboagye continues to be able to fly internationally, traveling to Ghana as recently as June of 2023. He also went to Ghana in October/November of 2022, February/March 2022, November 2021, and April 2021. In addition to Ghana, agents found on Aboagye's phone an application for a six-month visa for the United Kingdom, and the phone's location history reflects that he was in the UK in February 2023.[2]

Aboagye also has the financial means to flee. Agents have seemingly only scratched the surface of the web of accounts and financial resources available to, and transactions completed by, Aboagye. One can only wonder what else is out there. His claim to having only approximately $7,350 in assets (consisting mostly of his car and checking account) and earning several thousand dollars a month is

---

[2] Agents also found evidence that Aboagye may be romantically linked to a woman living in the U.K.—a woman he has referred to as his "wife" and whom he calls "My 1 and Only."

entirely belied by, among other things, the vast sums of money that have flowed through accounts he controlled, the Mercedes-Benz for which he paid in cash, and the $1.7 million he transferred out of the United States to Ghana since 2020, approximately **$351,000** of which was wired *within the past year alone*. In addition, when reporting to Pretrial about his financial assets, Aboagye admitted that he had purchased some property in Ghana that was worth about $6,000. So either he lied to Pretrial about the value of the property, or he deliberately withheld from Pretrial that he has an additional $1.6+ million in Ghana.

Much of this money is almost certainly illicit. As noted, it is not even apparent that Aboagye has had any source of legitimate income since 2018, other than a six-month stint at Kroger. *See id.* ("The Court further finds that the government has also demonstrated by clear and convincing evidence that Mr. Cohen poses an economic danger to the community because of the seriousness of the allegations in the indictment and the lack of evidence showing that Mr. Cohen has legitimately earned substantial income over the past decade . . . ."). Yet he is somehow able to accumulate and access such staggering sums of money, including taking frequent international trips, going skydiving for fun, and, according to Awuah, purchasing a flight to Dubai worth approximately $1,700 for Awuah for his birthday.

Indeed, Aboagye admits to having access to large amounts of cash or equivalents. He concedes that he once wired $100,000 to Ghana, and in total transferred $150,000 there. Agents also believe that Aboagye and Awuah have made multiple purchases of bitcoin worth at least $24,286, and that at least some of these funds were disbursed to known criminal bitcoin wallets, though agents have been unable to trace those cryptocurrency transactions any further. And according to Awuah, as recently as the day before their arrest, Aboagye directed Awuah to purchase $1,000 in bitcoin and to send it to an unidentified wallet address that Aboagye provided.

In his post-arrest interview, Aboagye claims that he has two businesses in Ghana (a hair salon and a water company), that he resells cellular phones from the United States in Ghana, and that he does side work fixing people's cellphones and computers. He claims to earn cash, resulting in the ability to deposit approximately $2,000 to $5,000 every three months into his Publix account. Money that he makes in Ghana is supposedly routed into his Publix account as well. Of course, one might fairly wonder whether any of this is true since **none of this was reported to Pretrial Services** and included in

their report. Ignoring the fact that these income sources, even if real, are unlikely to come close to accounting for the vast sums he is wiring overseas, his apparent lack of candor with Pretrial and the Court is troubling in itself and casts doubt on whether there are any conditions of release that could ensure his appearance in court.

Aboagye has other strong ties to Ghana. In addition to traveling there multiple times over the last several years and having family there, as noted, he reported in his post-arrest interview to having two business in Ghana. He also reported that he is building a university there. Furthermore, Awuah reported that Aboagye is building an apartment building in Ghana. Indeed, items found on Aboagye's phone include blueprints for a four-story hostel that he is building and a document titled "Proposed Building for George Aboagye at Ayeduase Shanti Region." There is also an invoice for building materials for what appears to be another eight-story hostel. Needless to say, the extent of such business interests in Ghana might explain the vast outflows of money Aboagye has sent overseas.

Undoubtedly, someone from Ghana living in the United States would have familial ties to Ghana, and perhaps some business interests, but it is precisely the vast extent of such financial and personal ties for Aboagye that reduce the cost for him of fleeing from the United States while increasing the costs of staying here given the risk of imprisonment if he is convicted of the charged offense. In other words, in addition to having the means and ability to do so, Aboagye now has the *incentive* to flee. As agents untangle more of Aboagye's schemes, his sentencing exposure grows. For someone who has never served time in prison and has significant ties abroad, he now has every reason to avoid being held to account.

## V. <u>CONCLUSION</u>

Aboagye is involved in a serious, long-running conspiracy to engage in business email compromises and romance scams. He has stolen over $500,000 from two elderly victims, and has likely defrauded dozens of others. He is facing significant prison time if convicted of this offense. He was born in Ghana, maintains Ghanaian citizenship, has traveled extensively there over the past several years, and by his own admission has several family members there. He lied to Pretrial Services about his employment, and lied some more about his financial assets. He intermittently and interchangeably poses as individuals named Samuel Dunnuck, Jordan Frazier, and George Clarke—and those are just the

false identities that law enforcement is aware of.  He may have multiple other identities, if the results of the search of his home are any indication.

The government respectfully submits that it has sufficiently shown by a preponderance of the evidence that Aboagye poses a serious risk of flight, and by clear and convincing evidence that he is an economic danger to the community.  Aboagye should be detained pending trial.

DATED: March 14, 2024　　　　　　　　　　　　　Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

　/s/_____
KEVIN YEH
S. WAQAR HASIB
Assistant United States Attorneys